FILED
2011 Mar-25  AM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JUANITA LYNNE HAWLEY-DANIEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-09-KOB-2324-NE** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social,** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

The claimant, Juanita Lynne Hawley-Daniel, filed an application for a period of disability and disability insurance benefits, as well as an application for Supplemental Security Income (SSI) on September 6, 2006.  In both applications, the claimant alleged disability beginning on August 5, 2006.  These claims were denied on December 7, 2006.  The claimant then filed a timely request for a hearing before an Administrative Law Judge (ALJ) on February 15, 2007.  The ALJ held a video hearing on October 22, 2008, in Gadsden, Alabama.  The claimant appeared in Huntsville while the ALJ presided over the hearing from Florence, AL.  In a decision dated January 13, 2009, the ALJ found that the claimant was not disabled under section 1614(a)(3)(A) of the Social Security Act.  The claimant then filed a request with the Appeals Council of the Social Security Administration, whereupon the Appeals Council denied the claimant's request for review.  The claimant has exhausted her administrative remedies, and this

1

court has jurisdiction under 42 U.S.C §§ 405(g) and 1631(c)(3).  For the reasons stated below, the decision of the Commissioner will be **AFFIRMED**.

## II.  ISSUES

The claimant appeals to this court to reverse the ALJ's decision asserting the following issues: (1) whether the ALJ's failure to consider the claimant's venous stasis and venous insufficiency as a severe impairment is a reversible error; (2) whether the ALJ properly considered the combined impact of the claimant's non-exertional impairments under 42 USC §§ 423(d)(2)(B); and (3) whether the ALJ adequately applied the pain standard in accordance with 423(d)(5)(A).

## III.  STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether substantial evidence in the record as a whole supports the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *See Richardson*, 401 U.S. at 401.

The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner.  *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The substantial evidence standard permits administrative decision makers to act with considerable

latitude, and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Even if this court would disagree with the Commissioner's findings, the court must affirm the findings if they are supported by substantial evidence. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A

3

> negative answer to any question, other than step three, leads to a
> determination of "not disabled."

*McDaniel v. Bowen*[1], 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520,

416.920.

The Eleventh Circuit applies a three-part test that applies when a claimant attempts to

establish disability through testimony of pain or other subjective symptoms. *Holt v. Sullivan*,

921 F.2d 1221, 1223 (11th Cir. 1991). This standard requires evidence of an underlying medical

condition in addition to either (1) objective medical evidence that confirms the severity of the

alleged pain, or (2) that the objectively determined medical condition is of such severity that it

can be reasonably expected to cause the claimant's alleged pain. *Id*. When the objective medical

evidence does not confirm the severity of the alleged pain, the question becomes whether the

underlying medical condition could reasonably be expected to give rise to the alleged pain. This

determination is a question of fact for the ALJ subject to the substantial evidence standard of

review. *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988). In applying this test, the ALJ must

explicitly articulate his reasons for rejecting the plaintiff's subjective complaints of pain; if the

ALJ fails to properly articulate his reasons for discrediting the plaintiff's subjective complaints of

pain, the testimony must be accepted as true. *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir.

1987).

## V.  FACTUAL HISTORY

At the time of the administrative hearing, the claimant was thirty-nine years old and had a

---

[1]Although *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI), the same sequence applies to disability insurance benefits. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

general equivalency diploma.  She took some college courses, but did not receive a college

degree.  The claimant testified that she is 5' 6 ½" tall and weighs 333 pounds and is unable to

work because of migraines, anemia, and cramping and swelling in her legs which, according to

her testimony, is caused by her weight.  (R. 29).  The claimant underwent gastric bypass surgery

in July 1999, at which time she weighed 459 pounds.  She testified that some months she loses

weight, while other months she gains weight.  The claimant's prior work includes Home Health

Aide, Security Guard, and production solderer.  (R. 48).

## A.  Medical Ailments

### *Migraine headaches*

Dr. Anjaneyulu Alapati, M.D., a neurologist, has treated the claimant since October 2005

for migraine headaches.  (139-41).  On February 8, 2005, Dr. Alapati admitted the claimant to

Huntsville Hospital for IV/DHE treatments for her headaches.  (R. 138).  She was released in an

"improved state" and Dr. Alapati noted that, at this time, she was taking Topomax and Valium at

night and had no reported side effects from either medication.  (R. 138).  In August 2006, Dr.

Alapati noted that the claimant ran out of her prescription two weeks prior to her hospital visit

and that her headaches were coming back.  (R. 136).  A few weeks later, on September 19, 2006,

the claimant presented at the Huntsville Hospital emergency room with complaints of headache,

fatigue, and bilateral jaw and leg pain.  (R. 155).

On December 4, 2006, the claimant was admitted to Huntsville Hospital where she

underwent IV/ DHE treatments for her headaches.  At this time, Dr. Alapati noted that he

believed the claimant's headaches were "more stress related than typical migraines."  (R. 436).

Over the course of the next two years, the claimant was admitted to the hospital on five different

occasions for treatment of her migraines.  (R. 324, 568, 785, 1099, 884).  On May 28, 2008, a doctor at the UAB-Huntsville Clinic, which the ALJ noted is the claimant's primary source of treatment, noted that the claimant was taking Topamax, Pamelor, and Roserem, which seemed "to control her migraines quite well."  (R. 853).

### *Malabsorption/ Leg Pain*

The claimant's gastric bypass surgery resulted in malabsorption syndrome.  (R. 677). Because the claimant's body is unable to properly absorb nutrients, she does not receive enough iron, B12, electrolytes or folic acid, and, as a result of this malabsorption, she has cramping and swelling in her legs.  A May 18, 2006 examination found that the claimant's left calf was five centimeters larger than her right calf because of swelling.  (R. 190).  However, a Venous Doppler examination performed the same day showed no evidence of intraluminal thrombus, or venous occlusion.  (R. 195).

On January 17, 2007, the claimant presented to UAB-Huntsville Clinic complaining of leg pain.  An examination found evidence of venous stasis in both legs.[2]  (R. 665).  A few days later on January 23, 2007, the claimant was admitted to Huntsville Hospital following a visit to the UAB-Huntsville Clinic, where physicians diagnosed her as iron deficient.  During her stay at Huntsville Hospital, she was infused with iron sucrose.  (R. 385).  On February 7, 2007, Dr. Brian Matthews, M.D., examined the claimant and noted that she had a  "clear cut iron deficiency" that would require IV therapy because of the trouble she had taking low doses of oral

---

[2]Venous Stasis is a condition of slow blood flow in the veins, most regularly the legs.  A patient with venous stasis, or a venous insufficiency, will generally experience swelling in the lower legs and will be more prone than normal to blood clots. THE MERCK MANUALS ONLINE MEDICAL LIBRARY, http://www.merckmanuals.com/professional/sec10/ch114/ch114i.html (last visited March, 8, 2011).

iron concentrates.  (R. 200).

On February 12, 2007, an examination of the claimant found pitting edema of the bilateral lower legs with both calves tender to touch and erythematous thickened skin (i.e. red and swollen) on both lower legs.  (R. 688).  Similarly, on March 6, 2007, the claimant presented to UAB-Huntsville Clinic, where a physician noted that she had blue discoloration around her ankles caused by venous insufficiency.  (R. 691).  Less than a month later on March 28, 2007, a physician at UAB-Huntsville Clinic prescribed the claimant pain medication for her leg pain.  However, the physician noted that he "offered this *only* because of how severe *she* was portraying her pain to be...."  The doctor claimed that he was "very uncertain about her condition as she gives many contradicting statements and would consider 'malingering' as a possibility."  (R. 701) (emphasis added).

Over the course of the next few months, claimant's legs and ankles remained swollen.  (R. 709, 721, 568, 738).  In April 2007, the claimant alleged severe pain in her legs, but missed an MRI appointment, for the second time, because of "out-of-town business."  (R. 705).  Although the attending physician at UAB-Huntsville Clinic noted that the claimant had been non-compliant with past recommendations, he decided to re-scheduled an MRI appointment for the claimant.  (R. 706).  The MRI results came back normal, with no significant findings.  (R. 712).  This same month, the claimant underwent a nerve block for left leg pain and was diagnosed with depression.  She was given a GAF score of 52.  (R. 238-39).  However, in the hearing before the ALJ, the claimant testified that she does not take any medication for depression.  (R. 44).

On April 23, 2007, the claimant again  presented at Huntsville Hospital with left leg pain.

Examinations, however, returned no sign of deep vein thrombosis.  An MRI of the claimant's left knee and abdomen also came back negative.  An MRI of the claimant's pelvis showed a cystic mass that the doctor believed could be contributing to her leg pain; however, despite being advised to see a UAB OB-Gyn regarding the issue, the claimant never followed up.  (R. 556).

At a check-up on May 28, 2008, the doctor advised the claimant to "maintain her usual activities."  (R. 856).  The claimant later testified that her usual activities include getting her son ready and driving him to school, preparing breakfast for her family, occasional grocery shopping, and doing any necessary chores (laundry, cooking dinner, general housework).  (R. 29-30, 33).

## B.  Hearing

At the hearing before the ALJ, the claimant testified that her headaches never completely go away.  She testified that, every two to three months, her headaches will reach the point where she has to go to the hospital for DHE treatments.  (R. 41).  Upon presenting to the hospital for DHE treatments, the claimant testified that she usually is admitted for three to four days.  Upon release from the hospital, the claimant testified that, while still present, her headaches are manageable.  (R. 43).

Regarding her malabsorption and leg pain, the claimant testified that she has to elevate her feet several times a day and is unable to lift heavy objects.  Additionally, she claimed that sometimes she is unable to put on a pair of socks or shoes due to the swelling in her feet.  (R. 32).  However, the claimant testified that the swelling in her legs is worse at night than during the day.  (R. 36-37).  She also noted that her feet and legs swell and hurt not only when she is walking, but also when she is sitting in a chair.  (R. 34-35). She testified that her daily activities include getting her son ready and driving him to school, preparing breakfast for her family,

8

occasional grocery shopping, and doing any necessary chores (laundry, cooking dinner, general housework).  (R. 29-30, 33).

### C.  Post-Hearing Submittals

The claimant presented additional evidence after the hearing in front of the ALJ, which the ALJ did not have the benefit of reviewing.  This new evidence was sent directly to the Appeals Council.  While evidence presented for the first time to the Appeals Council is part of the record, only evidence presented to the ALJ will be considered in determining whether substantial evidence supports the ALJ's decision, unless the Appeals Council granted review. *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 19998).  Nevertheless, because the new evidence in this case was presented to the Appeals Council, which noted that it received the evidence and included it in the record,  will become part of the administrative records, and therefore, will be considered by this court.  (R. 4) *See Dishong v. Astrue*, 2011 WL 867183, at *4 (M.D. Ala. March 14, 2011) (explaining that the district court is not able to consider evidence that has not been presented to the Appeals Council as to become part of the administrative record).   The additional medical evidence shows that the claimant presented to the UAB-Huntsville Clinic complaining of swelling in the lower left leg in January, February, April and June of 2009, after the ALJ hearing.  (R. 1180, 1175, 1171, 1167).  Exams showed that the claimant had no change in swelling or any evidence of infection, cellulitis, induration, or skin changes consistent with venous stasis.  (R. 1181, 1169).  While advising the claimant to elevate her leg as needed, the doctor also advised the claimant to maintain "regular exercise."  (R. 1170, 1174).

### D.  ALJ Opinion

In deciding whether the claimant was "disabled" under sections 216(i), 223(d) and

1614(a)(3)(A) of the Social Security Act, the ALJ applied the five-step evaluation set forth by the

Social Security Administration. *See* 20 C.F.R. § 416.920(a).  First, the ALJ determined that the

claimant has not engaged in substantial gainful activity since August 5, 2006, the alleged onset

date of disability.  (R. 13).  Under the second step of the analysis, the ALJ found that the

claimant had the following severe impairments: obesity; migraine headaches; vitamin B12, D,

and folic acid deficiencies; status post gastric bypass surgery; and status post hysterectomy.  (R.

13).  The ALJ held that these impairments, considered singly and in combination, result in more

than minimal limitations to the claimant's ability to engage in work-related activities.  (R. 13-

14).

 Under the third step of the analysis, the ALJ held that the claimant does not have an

impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (20 CFR §§ 404.1525, 404.1526,

416.925, 416.926).  After considering the claimant's symptoms, the ALJ determined that the

claimant

> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except that she needs to be able to alternate between
> sitting and standing at will; that she can occasionally bend, stoop, and crouch, but
> cannot do any crawling; that she can occasionally climb ramps and stairs, but
> cannot climb ladders, ropes, or scaffolds; that she cannot be around hazardous
> moving machinery or unprotected heights; that she can occasionally operate foot
> controls; that she does not have a commercial driver's license; and that she has no
> limitations on her ability to use her upper extremities.  (R. 14).

 In determining the claimant's residual functional capacity (RFC), the ALJ applied the

pain standard to the claimant's subjective complaints of pain and found that, while the claimant's

medically determinable impairments could reasonably be expected to cause the alleged

symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not credible." (R. 15). The ALJ reasoned that "objective tests have shown

no abnormalities that could reasonably be expected to produce" the claimant's alleged headaches.

He stated that neither the neurological examination by Dr. Alapati nor the computerized

tomography scan of the claimant's head showed any abnormalities. (R. 15). Additionally, the

ALJ reasoned that Dr. Alapati noted in his September 2007 report that the claimant's headaches

responded to Valium and appeared to be caused by stress rather than migraines. The ALJ also

recognized that a physician at the UAB-Huntsville Clinic, on May 18, 2008, noted that the

medication the claimant was taking for her headaches seemed to control them quite well. (R.

16).

Likewise, regarding the claimant's allegations of malabsorption, severe weakness, and

severe pain and swelling in her legs, the ALJ held that the objective medical evidence did not

support her complaints of pain. (R. 16). He explained that Venous Doppler studies of the left

leg, performed five different times, were all negative and showed no evidence of deep vein

thrombosis. Additionally, the ALJ explained that x-rays of the left tibia and fibula, as well as a

magnetic resonance scan of the left knee and lumbar spine, showed no abnormalities. Similarly,

he explained that the claimant's medical records show that disk spaces are well maintained, with

no evidence of abnormalities. (R. 16).

In applying the fourth step of the analysis, the ALJ relied on the testimony of vocational

expert, Martha Daniel. Ms. Daniel testified that, given the claimant's alleged ailments, she was

unable to perform any of her past relevant work. (R. 49). However, when the ALJ presented Ms.

Daniel with a hypothetical situation accounting for the claimant's ailments and limitations, Ms.

Daniel testified that jobs exist in the national economy that someone with the claimant's

limitations could perform.  (R. 49-50).  In his hypothetical, the ALJ specified that the proposed

jobs should have a sit/ stand option; be limited to only occasional postural maneuvers and

instances in which the employee would have to climb ramps or stairs; never require the employee

to work on ladders, ropes, or scaffolds; never require the employee to work around hazardous

machinery or unprotected heights; and should only require the employee to use her lower

extremities for occasional operation of foot controls.  (R. 48-49).  Ms. Daniel testified that jobs

meeting the hypothetical limitations include production assembly worker, mail sorter, and rental

clerk, all of which exist in significant numbers in the national economy.  (R. 49-50)  Therefore,

considering the claimant's medical history, along with the testimony of the vocational expert, the

ALJ held that the claimant is not disabled because she is able to perform jobs that exist in

significant numbers in the national economy.  (R. 18).

### VI.  DISCUSSION

### 1.  Venous stasis and venous insufficiency as severe impairment.

The claimant argues that the ALJ's failure to consider her venous stasis and venous

insufficiency as a severe impairment requires reversal.  (Pl.'s Brief 7-11).  These challenges

address step two in the ALJ's evaluation.  In step two of the sequential evaluation, an ALJ must

determine whether the claimant has a "severe" impairment or combination of impairments that

causes more than a minimal limitation on her ability to function.  *See Davis v. Shalala*, 985 F.2d

528, 532 (11th Cir. 1993).  An impairment is not severe only if it does not significantly limit the

claimant's physical or mental ability to perform basic work activities.  *Crayton v. Callahan*, 120

F.3d 1217, 1219 (11th Cir. 1997).  Basic work activities include: "(1) Physical functions such as

walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for

12

seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple

instructions; (4) Use of judgment; (5) Responding appropriately to supervision, coworkers, and

usual work situations; and (6) Dealing with changes in a routine work setting."  20 C.F.R. §

404.1521(b).  The claimant, however, bears the burden of proving that she has a severe

impairment or combination of impairments.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir.

1999).

     In the present case, while the ALJ did not specifically mention the terms "venous stasis"

or "venous insufficiency" in his analysis, he undoubtably took the symptoms that accompany her

complaints of such disease into consideration.[3]  In determining the claimant's residual functional

capacity, the ALJ specifically discussed the claimant's allegations of cramping and swelling in

her legs.  (R. 16-17).  Because the ALJ extensively addressed the claimant's leg pain and

swelling, which are her main and most pervasive symptoms of venous stasis and venous

insufficiency, the court rejects the claimant's argument that the ALJ erred in not determining

venous stasis and venous insufficiency as one of the claimant's severe impairments.

---

[3]In her brief, the claimant explained that chronic venous insufficiency is evidenced by edema and dilated superficial veins in a patient.  A patient suffering from venous insufficiency may complain of *fullness, aching or tiredness in the leg*, which may occur during standing or walking.  If a patient suffers from venous stasis/ insufficiency, with time, skin pigmentation appears on the ankle and lower leg.  Further complications include stasis determatitis and stasis ulceration in these areas.  Patients with chronic venous insufficiency may develop varicose veins, which are secondary to Deep Venous Thrombosis (DVT), are often mild, and function as collateral vessels.  *The Merck Manual*, § 16 Cardiovascular Disorders, Venous Thrombosis, Chronic Venous Insufficiency p. 1793 (17 Ed. 1999) (emphasis added) (discussed in Pl.'s Brief 7 n. 4).  DVT is the clotting of blood in a deep vein of an extremity and is the most common risk factor associated with venous insufficiency. *Deep Venous Thrombosis*, THE MERCK MANUALS ONLINE MEDICAL LIBRARY, http://www.merckmanuals.com/professional/sec07/ch081/ch081b.html (last visited March 15, 2011).

Additionally, after examination of the medical records, the court cannot find an instance when a physician specifically listed venous stasis or venous insufficiency as one of the claimant's diagnosed ailments.  Much of the evidence the claimant uses to support her argument that she suffered from venous stasis and venous insufficiency merely documents that her lower leg was *swollen* and *painful*.  (*See* Pl.'s Brief 9).  For example, the claimant cites pages 572, 692, 709, 721, and 738 of the medical records as evidence that the she suffered from venous stasis/ insufficiency.  (Pl.'s Brief 10).  However, none of these pages of the medical record list venous stasis or venous insufficiency as a current or past diagnosed medical ailment of the claimant.  In fact, the closest evidence the court can find to an actual diagnosis of venous stasis or venous insufficiency is the inclusion in each of these reports of "left lower leg swelling" or "localized swelling of the leg" as one of the claimant's known complaints.  (R. 570, 692, 709, 721, 738). Therefore, because the ALJ exhaustively discussed the claimant's allegations of *swollen* and *painful* legs, the court finds that substantial evidence exists to show that the ALJ sufficiently considered all of the claimant's medical ailments, including venous stasis and venous insufficiency, in making his determination.

Additionally, in her brief, the claimant argues that the ALJ should have given more importance to the Vocational Expert's (VE) testimony regarding a hypothetical that the claimant, herself, posed. (Pl.'s Brief 7-8).  The claimant asked the VE whether a person who is *required* to elevate her legs at heart-level or higher, three times a day for twenty to thirty minutes each time would be able to work.  (R. 51).  The VE answered negatively.  However, the medical records that were available to the ALJ at the time of the hearing did not include documentation suggesting that the claimant was required, or even *needed* to, elevate her legs throughout the day.

14

In fact, the only evidence of such necessity at the time of the hearing was the claimant's own testimony, which the ALJ discredited regarding her alleged leg pain.  Therefore, given the evidence available to him at the time of the hearing, the ALJ did not err in omitting this limitation/ stipulation from his hypothetical.

Since the hearing, the claimant has introduced new evidence regarding her need to elevate her legs throughout the day.  In reviewing this new evidence, however, the court does not find a specific order that the claimant elevate her legs at "heart-level or above" three times a day for twenty to thirty minutes each time.  In fact, the only documentation the court finds regarding leg elevation is from a June 29, 2009, doctor's report in which a UAB Huntsville Clinic physician, at the end of his report, advised the claimant to "continue elevating her leg."  (R. 1170).  However, a few months earlier and throughout the medical records, physicians advise the claimant to get "regular exercise."  (R. 1174).  The court believes that the claimant's suggestion that she must elevate her legs at heart-level or higher three times a day is inconsistent with physician's reports throughout the medical record that advise her to get regular exercise without any mention until June 2009, after the ALJ hearing, of elevating her legs.  (R. 51).  While it would assist the court to know what the physicians meant by "regular exercise," the court assumes that the physicians who suggested regular exercise believed the claimant was capable of such exercise without limitations.  Therefore, the court rejects the claimant's argument that she would be unable to work because of her need to continuously elevate her leg throughout the day, and concludes that the ALJ's rejection of such restriction in his hypothetical to the VE was not error.

For the above reasons, the ALJ determined that the claimant's statements concerning the intensity, persistence and limiting effects of her lower leg pain, which is the claimant's most

substantial symptom of venous stasis and venous insufficiency, are not credible.  In so holding,

the ALJ did not include venous stasis or venous insufficiency as one of the claimant's severe

impairments.  The ALJ clearly articulated substantial evidence supporting his determination to

discredit the claimant's allegations of lower leg pain.  Therefore, because this court is unable to

re-weigh evidence, it finds that substantial evidence supports the ALJ's determination that the

claimant's venous stasis or venous insufficiency was not a severe impairment.  *See Moore v.*

Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (explaining that the court does not re-weigh

evidence); *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991) (stating that the credibility

of witnesses is for the Commissioner to determine, not the courts.).

### 2.  Consideration of combined impact of non-exertional impairments.

The claimant argues that the ALJ failed to consider the combined impact of the necessary

treatments for her accepted "severe" impairments.  (Pl.'s Brief 13).  Where a claimant has alleged

several impairments, the ALJ has a duty to consider the impairments in combination and to

determine whether the combined impairments render the claimant disabled.  *Jones v. Dept. of*

*Health & Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991).  If the ALJ finds a medically

severe combination of impairments in step two of the sequential evaluation, the regulations

provide that the ALJ must consider the impact of the medically severe combination of

impairments throughout the disability determination process.  *Davis v. Shalala*, 985 F.2d 528,

532 (11th Cir. 1993).

The claimant argues that the ALJ's failure to consider the frequency and duration of the

treatment she receives for her migraines and malabsorption constitutes reversible error.  (Pl.'s

Brief 13).  However, the court finds substantial evidence that the ALJ considered the cumulative

effect of the claimant's  impairments, including frequency of treatment, when assessing whether to grant disability.  In *Wilson v. Barnhart*, the Eleventh Circuit held the ALJ's statement that the claimant "'did not have an impairment *or combination of impairments* listed in, or medically equal to'" a listed impairment "constitutes evidence that [the ALJ] considered the combined effects of [the claimant's] impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (emphasis in original). The ALJ in the present case made a similar statement in noting that "[t]he undersigned finds that these impairments, when considered both singly *and in combination*...constitute 'severe' impairments within the meaning of the regulations."  (R. 14) (emphasis added).   Therefore, under the established precedent, the court finds substantial evidence that the ALJ considered the claimant's ailments both separately and in combination.

The court also finds substantial evidence that the ALJ considered the impact that the claimant's migraine and malabsorption *treatments* have on her ability to work.  In his opinion, the ALJ found the claimant's allegations of pain uncredible because of the failure of objective tests to substantiate such pain; and he went on to list the objective tests to which he referred.  A full discussion of the ALJ's application of the pain standard is included under the third issue.

Additionally, although the court believes that the ALJ, in discrediting the claimant's complaints of pain regarding her migraines and malabsorption, as discussed in issue three, properly concluded that the frequency and duration of treatments for such ailments did not warrant a finding of disability, the court will address the arguments the claimant presented in her brief regarding this issue as well.  In *Cowart v. Schweiker*, the case cited by the claimant in support of her argument, the court held that "it is conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker*, 662

17

F.2d 731, 737 (11th Cir. 1981).  In this same case, however, the court cited a First Circuit opinion stating that "[a]t the very least, the administrative law judge should have made a finding on appellant's claim regarding side effects, making it possible for a reviewing tribunal to know that the claim was not entirely ignored." *Id.* (citing *Figueroa v. Secretary of HEW*, 585 F.2d 551, 554 (1st Cir. 1978).  The Eleventh Circuit in *Cowart* held that, because the ALJ did not even make the minimal showing that he had considered the side effects of the claimant's medication, the case should be reversed and remanded. *Id*.

In the present case, the claimant argues that, while not impacted by the "side effects" of her treatments, she is impacted by the frequency and duration of the treatments.  (Pl.'s Brief 13). Regarding the claimant's migraines, the ALJ  recognized that the claimant had been admitted to the hospital six times for treatment of headaches between December 2006 and October 2008.  (R. 15).  In September 2007, Dr. Alapati noted her headaches responded to Valium and appeared to be caused by stress rather than migraines.  Additionally, the ALJ explained that a physician at the UAB Huntsville Clinic noted that the medicine the claimant was prescribed for her headaches seemed to "control her migraines quite well."  (R. 16).  After considering the claimant's migraine treatments in light of these statements by the claimant's physicians, the ALJ found the claimant's subjective complaints of pain regarding her migraines were not credible and, therefore, the frequency of such treatments did not warrant a finding of disabled.  (R. 15).  Thus, under the Eleventh Circuit precedent, the court finds substantial evidence that the ALJ made at least a minimal showing that he considered the claimant's migraine treatments when making his ultimate decision. *See Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981)

Similarly, the court finds substantial evidence that the ALJ also considered the frequency

and duration of the claimant's malabsorption treatments.  The ALJ recognized that the claimant had a history of treatment for complaints of cramping and swelling in her legs, caused by malabsorption, since May 2006.[4]  (R. 16).  He also recognized that the claimant had been treated with B12 injections, vitamin supplements, and occasional IV iron treatment when her hemoglobin levels decreased.  (R. 16).  However, he also noted that a physician suggested to "consider malingering a possibility" with respect to the claimant's leg pain and, according to one of the claimant's physicians, "claimant's persistent left leg pain was likely due to multifactorial components with a psychiatric component as well."  (R. 16).  After considering the claimant's malabsorption treatments, in light of the entire medical record, the ALJ discredited the claimant's complaints of pain, as discussed under issue three, and therefore made at least a minimal showing that he considered the claimant's malabsoption treatments in making his ultimate decision.  *See Swindle v. Sullivan*, 914 F.2d at 226.

### 3.  The ALJ adequately applied the pain standard.

To satisfy the pain standard, evidence of an underlying medical condition must exist, in addition to either (1) objective medical evidence that confirms the severity of the alleged pain, or (2) that the objectively determined medical condition is of such severity that it can be reasonably expected to cause the claimant's alleged pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  When the objective medical evidence does not confirm the severity of the alleged pain, the question becomes whether the underlying medical condition could reasonably be expected to

---

[4]In January 2007, after being admitted to the hospital for iron sucrose treatments, a UAB-Huntsville Clinic physician ordered the claimant to receive B12 replacements one time a week for the following three months (February, March, and April 2007) and then once a month for life. He noted that the claimant had the option to self-administer the medication, but she refused to do so.  (R. 200, 680).

give rise to the alleged pain.  This determination is a question of fact for the ALJ subject to the

substantial evidence standard of review.  *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988).  In

applying this test, the ALJ must explicitly articulate his or her reasons for rejecting the plaintiff's

subjective complaints of pain; if the ALJ fails to properly articulate his or her reasons for

discrediting the plaintiff's subjective complaints of pain, the testimony must be accepted as true.

*Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).  However, the court does not re-weigh

evidence or substitute its judgment for that of the ALJ, but instead reviews the entire record to

determine if the decision reached is *reasonable* and supported by *substantial evidence*.

*Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence is such

relevant evidence that a *reasonable* person might accept as adequate to support the given

conclusion.  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

    In the present case the ALJ discredited the claimant's allegations of pain regarding both

the cramping and swelling in her legs and her headaches.  (R. 15-17).  The ALJ stated that

"objective tests have not supported her complaints of pain" and he listed several reasons for

discrediting the claimant's allegations of pain, including (1) five separate Venous Doppler

studies of the left leg were interpreted as being negative with no evidence of any deep vein

thrombosis; (2) X-rays of the left femur, knee, and pelvis in May 2006 were negative for any

abnormalities; (3) a magnetic resonance scan of the left knee in April 2007 was interpreted as

showing no abnormalities; (4) a magnetic resonance scan of the lumbar spine in April 2007 was

interpreted as being negative; (5) disk spaces were well maintained; (6) no evidence existed of

any spinal or foraminal stenosis; and (7) an electromyography of the left leg in February 2007

was interpreted as showing no abnormalities.  (R. 16).  Additionally, the ALJ stated that the

physician who saw the claimant at UAB-Huntsville Clinic in March 2007 noted that he was "very uncertain about [the claimant's] condition as she has given many contradicting statements and would consider malingering a possibility." (R. 16-17). The ALJ also noted that, while the claimant testified that she is unable to get out of her bed approximately seven days a month because of leg pain, "[t]he records of the UAB Huntsville Clinic and Dr. Alapati do not show that she has reported having weakness of such severity." (R. 17). In light of the above discussion, the court finds substantial evidence that the ALJ properly discredited the claimant's statements regarding the intensity, persistence and limiting effects of her leg pain because objective evidence does not support such statements.

Additionally, the ALJ discredited the claimant's allegations of migraine pain. The ALJ recognized that while the claimant *does* have some underlying medical conditions, the pain alleged from such conditions is *not* supported by the claimant's objective medical evidence, credibility, or residual functional capacity. The ALJ explained that in September 2007, Dr. Alapati noted the claimant's headaches responded to Valium and appeared to be caused by stress rather than migraines. Additionally, the ALJ explained that a physician at the UAB Huntsville Clinic noted that the medicine the claimant was prescribed for her headaches seemed to "control her migraines quite well." (R. 16). Therefore, in specifying his reasons for discrediting the claimant's allegations of pain, the ALJ was correct in concluding that the frequency and duration of treatments for such uncredible ailments did not warrant a finding of disabled.

## VII. CONCLUSION

The court concludes that the ALJ's determination that the claimant is not disabled is supported by substantial evidence, and that he applied proper legal standards in reaching this

determination.  Therefore, the ALJ properly rejected the claimant's disability claims.  The

Commissioner's final decision is, therefore, due to be **AFFIRMED**, and a separate order in

accordance with the memorandum of decision will be entered.

DONE and ORDERED this 25th day of March 2011.

_____

KARON OWEN BOWDRE

UNITED STATES DISTRICT JUDGE